**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BUZZFEED, INC.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civil Action No. 19-cv-3062 (DLF)** |
| **v.** | ) |
| | ) |
| **U.S. DEP'T OF HOMELAND SEC. &** | ) |
| **U.S. CUSTOMS AND BORDER** | ) |
| **PROTECTION,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure ("Rule") 56(c), the Department of Homeland Security and United States Customs and Border Protection ("CBP") (collectively "Defendants" or "CBP"), by and through the undersigned counsel, respectfully submit this Memorandum of Points and Authorities in Support of Defendants' Renewed Motion for Summary Judgment in response to the Complaint filed by Buzzfeed, Inc. ("Plaintiff").

## INTRODUCTION AND SUMMARY

This is Defendants' renewed motion for summary judgment. Plaintiff requested "databases" upon which a report on overcrowding at a detention center was based. Because Plaintiff sought "databases," Defendants did not have readily available responsive records, but after the parties conferred, Defendants proposed to release certain data and Plaintiff accepted. The resulting data production comprised of over 4,423,000 unredacted rows of responsive data released months after Plaintiff filed this action. Thereafter, Defendants moved for summary

1

judgment, but the Court denied it with regard to "A-Numbers or A-Number "alternates," detention center information, and certain database codes noting that Defendants had already released similar information in another litigation.  Defendants have since released the database lookup information from that other litigation so that Plaintiff is now on par with the plaintiff in that other case.

More than two years ago, Defendants customized responsive data based on Plaintiff's request for "event-centric" and not "person-centric" records.  In fact, Plaintiff specifically disavowed seeking personally identifying information.  It was only after Defendants' customization and production, that Plaintiff reversed course and requested personally identifying information.  Therefore, Plaintiff waived that request and it is too late and burdensome for Defendants to customize another response.  Furthermore, with regard to the A-Number or A-Number alternatives, Defendants' supporting declarations show that the release of apprehended individuals' information (who are mostly children) would result in an unwarranted invasion of personal privacy and Plaintiff cannot demonstrate a countervailing public interest.  Finally, the declaration also demonstrate that releasing any data that is more detailed than the sector-level data already released, especially given the volume of data, would risk circumvention of the law.

## **BACKGROUND**

In this FOIA action, Plaintiff seeks records pertaining to Defendants' Office of Inspector General's report about overcrowding and detentions of children and adults in the Rio Grande Valley aka "RGV Alert."  *See* ECF No. 1 at 2 ¶7.  Plaintiff was particularly interested in one sentence in the report that stated that "[i]n addition to the overcrowding we observed, Border Patrol's custody data indicates that 826 (31 percent) of the 2,669 children at these facilities had

2

been held longer than the 72 hours generally permitted under the TEDS standards and the *Flores Agreement.*" *See id.* Accordingly, Plaintiff requested "any and all databases containing records that [Defendants] used in" its RGV calculation. *Id.* Plaintiff also sought "all records documenting the structure and proper use of the aforementioned database," including internal user manuals, Glossaries and data dictionaries, columns, variables, record layouts and database schemas, etc. *See id.* The parties had moved and cross moved for summary judgment, *see* ECF Nos. 37, 39, and the Court denied both motions and specifically denied Defendants' motion in part. *See* ECF No. 50 ("Memo. Op.").

Plaintiff did "not challenge the adequacy of [Defendants'] searches for responsive records" or "object to all of CBP's withholdings," but challenged withholdings of unique identifying information about individuals under FOIA Exemptions 6 and 7(C) as well as more specific locations of CBP encounters and operations and technical database documentation about the EID database under FOIA Exemption 7(E). Memo. Op. at 3. Because the Court appeared to accept Defendants' explanation and justification that Alien or A-numbers "could reveal immigrants' identities" in a way that "alternate unique database identifiers" may not, it "direct[ed] [Defendants] to supplement its declaration to address whether there are any alternate unique database identifiers, and if there are, to identify the privacy interests associated with each." Memo. Op. at 6.

Regarding Defendants' FOIA Exemption 7(E), the Court denied Defendants' redaction because it "remain[ed] unclear . . . how the release of *detention center* information, as opposed to the *apprehension* location information, would enable traffickers and others to evade law enforcement. [emphasis added]" Memo. Op. at 10. Although the Court awarded summary

3

judgment to the Defendants with regard to certain "EID documents," like here "schemas, manuals, and relationships under Exemption 7(E), it denied it as to "other records" that had been released in recent litigation involving database lookup records and required Defendants to distinguish between both. *See id*. at 12-13. Since the Court's ruling, Defendants have released the lookup dictionary that was released in prior litigation. The information that was released in its entirety should mean that issue is resolved..[1] Thus, the remaining issues would appear to be related to A-numbers or alternative personal identifiers and the detention center information.

Because Plaintiff's request was not a paragon of clarity, Defendants responded with "over 4,423,000 unredacted rows of responsive data[,] contain[ing] the following data fields: Border Patrol sector, Date and Time of Apprehension, Citizenship, Gender, Age, Demographic, Time in the U.S., Data and Time of Initial Booking, Date and Time of Final Booking, Time in Custody." Memo. Op. at 2; *see also* ECF No. 37-3, Declaration of Patrick Howard in support of Defendant's Motion for Summary Judgment ("Howard Decl.") ("I understood that the parties had resolved for CBP to produce responsive documents with the parameters [above], produced as a single entry for each apprehension, as opposed to a summary report."). In its request, Plaintiff expressly stated that "[a]ll columns containing A-file information can be pre-emptively removed and/or redacted." ECF No. 1-1. Plaintiff's request for "facility name[s], and a unique identifier like an A number" first arose after Defendants put together their response to Plaintiff's request

---

[1] Defendants have sought to confer with Plaintiff's counsel regarding whether the release of records from *ICE* litigation after this Court's ruling has mooted this issue. Plaintiff's counsel responded that "I took a closer look at this and I'm rather confused. I think it would be best, if the agency contends that this production satisfies some part of the request for which the court denied [summary judgment], for the agency to put that into its [renewed summary judgment] brief so I can understand it in context. Defendants have attempted to clear up Plaintiff's Counsel's "confusion" without much success.

for records.  *See* Exhibit A, e-Mail from Plaintiff's Counsel dated February 5, 2021; *see also*

Parties' Joint Status Report, ECF No. 28 ("Plaintiff has completed reviewing the records.

Plaintiff raised some additional concerns and is awaiting Defendant's response.").  Although

Plaintiff had previously expressly disavowed seeking A-Number or other identifying

information, Plaintiff changed course after Defendants customized a response to Plaintiff's FOIA

request and provided a response.

"The FOIA request in this matter called for event-specific data regarding encounters by

Border Patrol Agents engaged in enforcement operations, as well as personal biographic

information about individuals, supplied by or about such individuals, and collected by Border

Patrol Agents in the course of encounters with such individuals.  *See* Exhibit B, Declaration of

Debra L. Danisek ("Danisek Decl.") at 1 ¶3;  *see also* Exhibit C, Declaration of Jay Visconti

("Visconti Decl.") at 3 ¶ 6 (These applications and systems are "for processing, identification,

and verification of violators encountered by [CBP] Agents conducting law enforcement duties.

"Because no single report or record captured all the different biographic and event data fields

demanded by Plaintiff, CBP created, for purposes of resolution of this litigation, new and

customized code to cull the agreed-upon information from e3-sourced Border Patrol data saved

in SNAP for each of the agreed upon years."  Visconti Decl. at 3 ¶7.[2]

---

[2]      "The CBP e3 portal consists of a series of web applications that collect and
transmit collected data to a shared . . . DHS system [Enforcement Integrated Database ("EID")]
for processing, identification, and verification of violators encountered by [CBP] Agents
conducting law enforcement duties.  The e3 is a transactional interface and does not store the
collected data. Instead, e3 is used as a portal to transmit data in real-time from [CBP] Agents and
retrieve records for CBP enforcement purposes.  [CBP] Agents and [] Officers collect
[Personally Identifiable Information ("PII")] from subjects as part of the law enforcement
apprehensions workflow . . . Public information regarding the e3 portal and BPETS is available
at: DHS/ICE-011 - Immigration and Enforcement Operational Records System (ENFORCE)

"This customized query did not pull A-numbers or fingerprint identification numbers as A-numbers and fingerprint identification numbers are considered to be sensitive [PII] exempt from disclosure under FOIA."  Visconti Decl. at 3 ¶7 (citing Danisek Decl.).  The Visconti Decl. further states that:

> Neither the query nor the underlying dataset included a database-generated, person-specific identifier.  The underlying dataset does include a database-generated, event-specific identifier linked to the details of a particular apprehension.  This event-centric identifier is unique to CBP database systems and can be used to navigate the systems if unauthorized parties were to ever access CBP's sensitive law enforcement systems.  Relying on A-numbers, fingerprint identification numbers, or database-generated event-centric identifiers to track an individual person across multiple datasets could yield incomplete or misleading results.  For example, not every noncitizen is issued an A-number; fingerprint data may be incomplete; and a single person who has encountered USBP multiple times may have multiple database-generated event-centric identifiers.

*Id.*

"Retrieving A-numbers or fingerprint identification numbers would require rewriting the customized query and conducting a new search in this case." Visconti Decl. at 4 ¶9. Anonymizing A-numbers or fingerprint identification numbers would require creation of an entirely new field of data across multiple datasets . . . [and] is possible from a coding perspective, but so is decrypting and disclosing these original identifiers." *Id.*  "Reverse engineering the cypher key used to anonymize data would be possible, particularly if the original

---

May 3, 2010, 75 FR 23274 and DHS/USVISIT-0012 - DHS Automated Biometric Identification System (IDENT) June 5, 2007,72 FR 31080; https://www.dhs.gov/sites/default/files/publications/privacy-pia-cbp046-bpets-august2017.pdf; and DHS/CBP-023 Border Patrol Enforcement Records System of Records (BPER), 81 Fed. Reg. 72601 (October 20, 2016), available at https://www.dhs.gov/system-records-notices-sorns. Visconti Decl. at 2 ¶4.

identifier were known in some instances." *Id.* "[A]n unauthorized party with access to [Defendant's] database systems, such as a hacker or insider threat, could use these unique identifiers to more quickly or surreptitiously navigate to information regarding private individuals encountered by CBP, as well as specific data detailing." *Id.* 3-4 ¶ 8. Regarding the Sector versus station data, "[t]o further subdivide the data relating to Sectors into more specific locations linked to particular Border Patrol Stations risks revealing if and when coverage areas between Border Patrol Stations overlap or have gaps, which Station's Agents may face the heaviest workload at any given time." *Id.* at 4-5 ¶10. "Such information may facilitate circumvention of U.S. law by enabling violators to choose to illegally cross or facilitate smuggling of persons across the border within the area of operation of a particular Station that has shown to have lower rates of apprehensions." *Id.*

Finally, although Plaintiff expressly disavowed PII until after Defendants' customized search and production, even if they had not, A-numbers are "particularly sensitive and alone presents an increased risk of harm to an individual if disclosed." Danisek Decl. at 2 ¶6. "A-numbers and fingerprint identification numbers link individuals to files that may contain highly personal and sensitive information" that "could result disclosure would negatively impact a substantial privacy interest." *Id.*

## **STANDARD OF REVIEW**

### a.    **General Summary Judgment Standard**

Where no genuine dispute exists as to any material fact, summary judgment is required. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. *Id.* at 247. "The burden on the moving party

may be discharged by 'showing'—that is, pointing out to the [Court]—that there is an absence of evidence to support the non-moving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987).  In *Celotex Corp. v. Catrett*, the Supreme Court held that, in responding to a proper motion for summary judgment, the party who bears the burden of proof on an issue at trial must "make a sufficient showing on an essential element of [his] case" to establish a genuine dispute.  477 U.S. 317, 322-23 (1986).

> **b.**    **Summary Judgment Standard as Applied to FOIA Cases**

FOIA cases are appropriately resolved at summary judgment.  *See Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).  For purposes of summary judgment, an agency's decision to withhold information from a FOIA requester is subject to *de novo* review by the Courts.  *Hayden v. Nat'l Sect. Agency*, 608 F.2d 1381, 1384 (D.C. Cir. 1979).  In a FOIA suit, an agency is entitled to summary judgment once it demonstrates that no material facts are in dispute and, if applicable, that each document that falls within the class requested has been produced, is unidentifiable, or is exempt from disclosure.  *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001); *Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980).

"Under the Federal Rules of Civil Procedure, a motion for summary judgment cannot be 'conceded' for want of opposition.  The burden is always on the movant to demonstrate why summary judgment is warranted.  The nonmoving party's failure to oppose summary judgment does not shift that burden.  The District Court must always determine for itself whether the record and any undisputed material facts justify granting summary judgment." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) (internal quotations omitted).

An agency may satisfy the summary judgment requirements in a FOIA case by providing the Court and the Plaintiff with affidavits or declarations and other evidence, which show that the documents in question were produced or are exempt from disclosure. *Hayden*, 608 F.2d at 1384; *Church of Scientology v. Dep't of Army*, 611 F.2d 738, 742 (9th Cir. 1980); *Trans Union LLC v. FTC*, 141 F. Supp. 2d 62, 67 (D.D.C. 2001) (summary judgment in FOIA cases may be resolved solely on the basis of agency affidavits "when the affidavits describe 'the documents and the justifications for non-disclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'") (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)); *see also Pub. Citizen, Inc. v. Dep't of State*, 100 F. Supp. 2d 10, 16 (D.D.C. 2000), *aff'd in part, rev'd in part*, 276 F.3d 634 (D.C. Cir. 2002).

## **ARGUMENT**

### a.    **Plaintiff Never Timely Requested A-Numbers or Substitutes**

In their FOIA request, Plaintiff expressly disavowed seeking A-Number or other PII until after Defendants had customized a response to their highly unusual request for "databases." Therefore, Plaintiff waived that request.  Even if Plaintiff had requested A-Numbers or other PII, Defendants' submissions demonstrate why release of that information would have violated many individuals' personal privacy especially given that Plaintiff did not submit any releases from these individuals.  Moreover, Plaintiff has not posited a public interest that would outweigh these individuals' privacy interests.

"Under FOIA, an agency is only obligated to release nonexempt records if it receives a request that 'reasonably describes such records.'"  *Evans v. BOP*, 951 F.3d 578, 583 (D.C. Cir.

2020) (quoting 5 U.S.C. § 552(a)(3)(A)); *see also Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180, 185 n.3 (D.C. Cir. 2013) ("duties that FOIA imposes on agencies . . . apply only once an agency has received a proper FOIA request.").  The D.C. Circuit explained in *Irons v. Schuyler*, 465 F.2d 608 (D.C. Cir. 1972), that the "identifiable records" requirement "calls for a reasonable description enabling the Government employee to locate the requested records." *Id*. at 612 (quoting *Bristol-Myers Co. v. FTC*, 424 F.2d 935, 938 (D.C. Cir. 1970)). Accordingly, it held that a request—for "all unpublished manuscript decisions of the Patent Office, together with such indices as are available"—was not a request for "identifiable records" because "the contours of the records . . . described are so broad in the context of the Patent office files as not to come within a reasonable interpretation of 'identifiable records[.]'" *Id*. at 610, 613.

Although Defendants are not arguing that Plaintiff's FOIA request was hopelessly defective, Plaintiff did fail to reasonably describe the records sought, which made it necessary for the parties to confer about what exactly Plaintiff was requesting and for Defendants to customize a data pull responsive to the request.  Because Plaintiff did not reasonably describe the records sought and, moreover, specifically disavowed A-Numbers and PII, it cannot now oppose summary judgment on the grounds that it did not receive records or data it did not request.  To be clear, Plaintiff expressly stated that "[a]ll columns containing A-file information can be pre-emptively removed and/or redacted."  ECF No. 1-1.  Plaintiff's request for "facility name[s], and a unique identifier like an A number" first arose after Defendants put together their response to Plaintiff's request for records.  *See* Exhibit A; *see also* ECF No. 28 ("Plaintiff has completed reviewing the records. Plaintiff raised some additional concerns and is awaiting Defendant's

response.").  It is also worth noting that the adequacy of Defendants' search has never been an issue throughout the duration of this litigation.  See Memo. Op. at 3 (citing Plaintiff's Cross-Motion for Summary Judgment, ECF No. 39-1) ("Buzzfeed does not challenge the adequacy of the government's searches for responsive records[.]").

"[F]orfeiture is the failure to make the timely assertion of a right[;] waiver is the intentional relinquishment or abandonment of a known right." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 n.1 (2017) (alterations in original) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).  Once the parties have appeared in a civil matter, they routinely agree to narrow the issues in dispute or to give up important procedural rights.  *See Am. Ctr. for Law & Justice v. DOJ*, 325 F. Supp. 3d 162, 168 (D.D.C. 2018).  If they could not, civil litigation would not serve its purpose of offering a "just, speedy, and inexpensive determination of every action." *Id*. (citing Fed. R. Civ. P. 1).  "When the parties make representations at a conference about which issues remain outstanding, they may fairly be held to those oral representations." *Id*.  Moreover, waiver or forfeiture is appropriate where "'[t]he plain meaning of the joint status report makes clear that the plaintiff narrowed her FOIA request to require CBP to produce only [certain documents],' and the joint status report was not 'ambiguous on this point.'" *Gilman v. Dep't of Homeland Sec.*, 32 F. Supp. 3d 1, 22 (D.D.C. 2014).  "[W]here sophisticated parties to a FOIA case have agreed to narrow the issues in a written status report, they generally may be held to their agreement under traditional waiver principles." *Am. Ctr. for L. & Just.*, 325 F. Supp. 3d at 168.

In this case, because Plaintiff's request did not reasonably describe the records sought, the parties conferred to discuss and "narrow" the scope of the request resulting in Defendants customizing a search to return responsive data.[3]  The risks associated with its request, which did not reasonably describe the records sought, should be borne by Plaintiff.  Once a plaintiff agrees to an agency's interpretation of an ambiguous request, "plaintiff cannot allege that the agency failed to produce responsive records when the records he now identifies fall outside the scope of his appropriately narrowed request."  *Wilson v. Dep't of Transp.*, 730 F. Supp. 2d 140, 153 (D.D.C. 2010) (quoting *Kenney v. DOJ*, 603 F. Supp. 2d 184, 189 (D.D.C. 2009)). This is even more so true where Plaintiff knowingly engaged in discussions to narrow the scope of the request and disavowed individuals' A-Numbers and other PII.  Thus, for the foregoing reasons, Plaintiff may not now request A-Numbers or other alternate PII because it did not request that data as part of its FOIA request and in fact specifically disavowed that data.

**b.   A-Numbers or Alternate PIIs are Protected under FOIA Exemptions 6/7(C)**

Even if Plaintiff's had timely requested A-Numbers or other "alternative unique identifiers," such information would be protected by FOIA Exemptions 6 and 7(C) because the release of personally identifying information about the individuals, mostly children, Plaintiff seeks would result in a clearly unwarranted invasion of personal privacy and Plaintiff would be

---

[3]     It is a bit of a misnomer to call the release of "over 4,423,000 unredacted rows of responsive data" a narrowing.  Memo. Op. at 2 ("Over the following months, CBP worked with Buzzfeed to "narrow and clarify the scope of" the request . . . In November 2020, this resulted in "a spreadsheet file for each fiscal year from FY2010 to FY2020" with "over 4,423,000 unredacted rows of responsive data.").  Plaintiff had an opportunity to ask for all the data the wanted and did.

unable to demonstrate a public interest that outweighs these individuals' privacy interests especially since Plaintiff has not submitted any privacy waivers.

Defendants released a spreadsheet file containing "over 4,423,000 unredacted rows of responsive data" covering a ten year period containing data fields for: Border Patrol sector, Date and Time of Apprehension, Citizenship, Gender, Age, Demographic, Time in the U.S., Data and Time of Initial Booking, Date and Time of Final Booking, Time in Custody.  Memo. Op. at 2. Notable, again, is that Defendants provided all the data that Plaintiff requested as part of the narrowing discussions and raised the issue of A-Numbers after Defendants' customized response and the issue of "alternative unique identifiers" even later.  In denying Defendants' initial motion, the Court appeared to be focused more on "privacy concerns associated with the release of alternate unique database identifiers ([more] than the A-Number[s]), and concluded that it could not "weigh the privacy versus the public interests, as required under Exemption 7(C)."  *Id.* at 7.  Still, the Court ordered Defendants to submit a declaration addressing "whether any unique identifiers (other than the A-number) exist in the EID and address the privacy interests with respect to any such identifiers . . . [and] how the release of A-numbers would invade the individuals' privacy without knowledge of their names, addresses, dates of birth, or other identifying information."  *Id.*[4]

---

[4]      Plaintiff's FOIA request was limited to "any and all databases containing records on which the calculation in the above sentence are based" (quoting statistics from the July 2, 2019 Management Alert).  The quoted statistic expressly cited "Border Patrol's custody data." The Visconti Declaration resolves an ambiguity in the Howard Declaration by clarifying that the responsive data was gleaned, not directly from EID, but from a "snapshot" of a subset of EID data utilized in CBP operations, statistical analysis, and reporting, *i.e.*, Border Patrol's custody data.

Even if Plaintiff's had requested it, Defendants' "customized query did not pull A-numbers or fingerprint identification numbers" because these are "considered to be sensitive personally identifiable information exempt from disclosure under FOIA."  Visconti Decl. at 3 ¶ 7; Danisek Decl. at 2 ¶ 5-6.  Perhaps this is why Plaintiff disavowed these data points in the first place.  Defendants consider this to be PII "which if lost, compromised, or disclosed without authorization, could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual."  Danisek Decl. at 2 ¶ 5.  "As a standalone element of Sensitive PII, the A-number is particularly sensitive and alone presents an increased risk of harm to an individual if disclosed. A-numbers and fingerprint identification numbers link individuals to files that may contain highly personal and sensitive information."  *Id*. ¶ 6.  "In the event of unauthorized access to CBP systems, such as via hacking or insider misuse, these identifiers could be used to quickly access identifying information about specific people and their private information in the CBP database, as well as sensitive law enforcement data about the encounter[.]."  Visconti Decl. at 4-5 ¶¶ 8-10. "Anonymizing A-numbers" or creating "alternates" "is possible from a coding perspective, but so is decrypting and disclosing these original identifiers."  *Id*.

Like social security numbers and addresses, disclosure of a unique identifier like an A-Number is exempt from disclosure pursuant to Exemptions 6 and 7(c) as disclosure would pose an unwarranted invasion of privacy of those people whose encounters with Border Patrol are reflected in the production. Production of this personally identifiable information could lead to identifying the third-party individuals.  *See Long v. ICE*, 279 F. Supp. 3d 226, 244 (D.D.C. 2017) ("The court holds that Defendant properly invoked Exemption 6 to withhold the names and contact information of those individuals who prepare and receive snapshots of the EID because

14

the public interest in disclosure does not outweigh the individuals' privacy interest in nondisclosure.").

Although the records that an agency locates in response to a request for records ordinarily must be produced, FOIA authorizes agencies to withhold certain documents and information; namely, those that satisfy the requirements of any of the nine statutory exemptions. *See Milner v. Dep't of Navy*, 562 U.S. 562, 564 (2011). Exemption 6 shields information about individuals in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects law enforcement records or information when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). For FOIA Exemption 6 to apply, the information at issue must be maintained in a government file and "appl[y] to a particular individual." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). For FOIA Exemption 7's threshold, "[a] record is considered to have been compiled for law enforcement purposes if it was created or acquired in the course of an investigation related to enforcement of federal laws and nexus between the investigation and one of the agency's law enforcement duties is based on information sufficient to support at least a colorable claim of its rationality." *Quinon v. FBI,* 86 F.3d 1222, 1228 (D.C. Cir. 1996).

Once these thresholds are met, FOIA Exemption 6 requires the agency to balance the individual's right to privacy against the public interest in disclosure, s*ee Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976); *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991), and FOIA Exemption 7(C) embodies heightened privacy protections. *See Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989); *NARA v. Favish*, 541 U.S. 157, 165-66 (2004).

"[T]he privacy inquir[ies] of Exemptions 6 and 7(C) are essentially the same," although

Exemption 7(C) sets a lower invasion threshold to justify withholding. *Jud. Watch, Inc. v. Dep't*

*of Just.*, 365 F.3d 1108, 1125 (D.C. Cir. 2004); *see also ACLU v. Dep't of Just.*, 655 F.3d 1, 6

(D.C. Cir. 2011) (Exemption 7(C) provides similarly, albeit broader, privacy protections and

"establishes a lower bar for withholding material."). Privacy is of particular importance in the

FOIA context because disclosure under FOIA is tantamount to disclosure to the public at large.

*See Painting & Drywall Work Preservation Fund, Inc. v. HUD*, 936 F.2d 1300, 1302 (D.C. Cir.

1991). Thus, the Supreme Court has adopted a broad construction of the privacy interests

protected by Exemptions 6 and 7(C). *See Reps. Comm.*, 489 U.S. at 763.

By contrast, the courts have narrowly construed the public interest in disclosure of

information. The "only relevant 'public interest in disclosure' to be weighed in this balance is

the extent to which disclosure would serve the 'core purpose of the FOIA,' which is

contribut[ing] significantly to public understanding of the operations or activities of the

government.'" *Dep't of Def. v. FLRA*, 510 U.S. 487, 495 (1994) (quoting *Reps. Comm.*, 489

U.S. at 775); *see also Lepelletier v. FDIC*, 164 F.3d 37, 46-47 (D.C. Cir. 1999) ("[T]he only

relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the

information sought would she[d] light on an agency's performance of its statutory duties or

otherwise let citizens know what their government is up to."). "Information that 'reveals little or

nothing about an agency's own conduct' does not further the statutory purpose." *Beck v. Dep't*

*of Just.*, 997 F.2d 1489, 1492 (D.C. Cir. 1993). Plaintiff bears the burden of demonstrating that

the release of the withheld information would serve this interest. *See Carter v. Dep't of Com.*,

830 F.2d 388, 391-92 & nn.8 & 13 (D.C. Cir. 1987).

D.C. Circuit decisions "have consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records[.]" *Schrecker v. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003) (collecting cases). Indeed, in *SafeCard*, the Circuit "adopted a categorial rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Schrecker*, 349 F.3d at 661 (quoting *SafeCard*, 926 F.2d at 1206). FOIA makes no exception for the privacy interests of those with criminal records or aliens. *Shaw v. Dep't of State*, 559 F. Supp. 1053, 1067-68 (D.D.C. 1983) (noting that "the predictable damage to the individual's privacy, including the potential damage to the individual's reputation and livelihood was weighed and balanced against the benefit to the general public that would flow from the release of the information" outweighed any public interest).

In light of the related nature of the inquiries under Exemptions 6 and 7(C), CBP mostly applied the exemptions here jointly and defends them as such. Here, CBP asserted Exemption 7(C) (along with Exemption 6) to protect unique identifiers like a A-Numbers because disclosure would pose an unwarranted invasion of privacy of those people whose encounters with Border Patrol are reflected in any such production. *See* Danisek Decl. at 2 ¶ 6. These redactions are appropriate under D.C. Circuit precedents.

For example, in *National Ass'n of Retired Federal Employees v. Horner*, 879 F.2d 873, 878 (D.C. Cir. 1989), the plaintiff sought personal identifying information of retirees for the purpose of recruiting them. The D.C. Circuit held that the information was protected under FOIA Exemption 6 because there was a substantial probability that there would be an invasion of

privacy, as others would not overlook an opportunity to obtain such a list of qualified prospects for goods, services, and causes likely to appeal to financially secure retirees. *Id.* Similar concerns undergirded the rulings in *Department of Air Force v. Rose*, 425 U.S. 352 (1976), and *Arieff v. Department of Navy*, 712 F.2d 1462 (D.C. Cir. 1983), where although the records in question did not on their face identify particular individuals, sufficiently motivated members of the public might be able to link the information to specific individuals. Clearly, personal identifiers like an individual's social security number has a specific relationship to that individual, thus meeting the threshold requirement for Exemption 6 protection. *See Prison Legal News v. Lappin*, 780 F. Supp. 2d 29, 40 (D.D.C. 2011).

When courts find that the records were correctly redacted under Exemption 6, they need not examine FOIA Exemption 7(C), which offers greater protection for law enforcement records. *Smith v. Dep't of Labor*, 798 F. Supp. 2d 274 (D.D.C. 2011). Indeed, protecting individuals against the stigma of being mentioned in the context of a law enforcement investigation is the precise purpose of Exemption 7(C). *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Just.*, 658 F. Supp. 2d 217, 239 (D.D.C. 2009). In this case, Defendants' decision to withhold border crossing violators' A-Numbers and other identifying information is proper under FOIA Exemption 7(C). *See Banks v. Dep't of Just.*, 813 F. Supp. 2d 132, 143-44 (D.D.C. 2011) (approving of agency's withholdings of personal information such as address and phone numbers of individuals who provided information in the investigation, Social Security numbers, drivers' license numbers, credit card numbers and license plate numbers under Exemption 7(C)); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007 (withholding the names, addresses, telephone numbers, social security numbers, and other such private information

18

regarding law enforcement officials, and unnamed third-parties is appropriate under FOIA

Exemption 7(C)); *Banks v. Dep't of Just.*, 757 F. Supp. 2d 13, 18 (D.D.C. 2010) (withholding

names of and identifying information about crime victims mentioned in the law enforcement

records of the Federal Bureau of Prisons); *see also Long*, 279 F. Supp. 3d at 244.  Moreover,

Plaintiff has not pointed to any evidence that disclosure of the personal information contained in

the records would shed light on illegal activity by Defendants or that the incremental public

interest in such information is sufficient to outweigh the privacy interests at stake.  *See Banks*,

813 F. Supp. 2d at143-44 (citing *SafeCard*, 926 F.2d at 1206).  Thus, the Court "need not linger

over the balance; something, even a modest privacy interest, outweighs nothing every time."

*Horner*, 879 F.2d at 879.

### C.    CBP Properly Redacted Information under FOIA Exemption 7(E)

"Plaintiff demands that individual line entries be further subdivided to specify each

Border Patrol station or operational site[.]"  Howard Decl. at 8 ¶ 31.  Defendants "produced

location information identifying the 'Sector' (identification of one of the 20 USBP regions[]) in

which the encounter occurred" and argued that "[f]urther parsing of the location data, in a data

production of this size, would disclose law enforcement sensitive techniques and procedures, and

enable circumvention of law enforcement by yielding patterns and inferences about operational

capacity, staffing, resource allocation, and transfer routes."  Howard Decl. at 8 ¶ 31; *see also*

Memo. Op. at 9.  immigrants").  It appears that the Court was skeptical that "the release of

detention center information, as opposed to the apprehension location information, would enable

traffickers and others to evade law enforcement" and asked Defendants to submit a supplemental

declaration. Memo. Op. at 8-9.

Since the Court's ruling, Defendants have provided information to the Plaintiff that the Court cited in its opinion.  Memo. Op. at 8-9 (citing *Am. Immig. Council v. U.S. Immig. & Customs Enf't*, 464 F. Supp. 3d 228, 244-45 (D.D.C. 2020)).  Specifically, Defendants produced 73 pages of abbreviations, glossary of terms, processing disposition codes, charging and entry status codes.  *Id*.  Moreover, some of this information is publicly available documents at https://www.cbp.gov/newsroom/stats/cbp-public-data-portal; Nationwide Encounters Data Dictionary (cbp.gov); and Southwest Land Border Encounters Data Dictionary (cbp.gov)).  "Border Patrol's law enforcement operations are organized geographically into Sectors, each comprised of a number of Border Patrol Stations . . . [which] are short term holding facilities from which non-citizens are normally moved out of CBP custody within 72 hours."  Visconti Decl. at 4 ¶ 10.  "These stations are designed primarily for initial processing and support Border Patrol's administrative and enforcement operations, as compared to detention facilities operated by ICE, which are designed for longer term holding of noncitizens.  To further subdivide the data relating to Sectors into more specific locations linked to particular Border Patrol Stations risks revealing if and when coverage areas between Border Patrol Stations overlap or have gaps, which Station's Agents may face the heaviest workload at any given time."  *Id*.  "Such information may facilitate circumvention of U.S. law by enabling violators to choose to illegally cross or facilitate smuggling of persons across the border within the area of operation of a particular Station that has shown to have lower rates of apprehensions."  This facility-level capacity data can easily be exploited by hostile actors."  *Id*.

Exemption 7(E) protects law enforcement records or information when disclosure "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would

disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). CBP is a law enforcement agency for FOIA Exemption (b)(7)(E) purposes. *McRae v. Dep't of Just.*, 869 F. Supp. 2d 151, 169 (D.D.C. 2012) (holding that CBP "codes, case numbers, and other computer information pertaining to [various databases] . . . are techniques and procedures for law enforcement investigation."); *Touarsi v. Dep't of Just.*, 78 F. Supp. 3d 332, 349 (D.D.C. 2015) (same); *Gamboa v. Exec. Off. for U.S. Attys.*, 65 F. Supp. 3d 157, 169 (D.D.C. 2014) (same).

This exemption generally protects information that would reveal law enforcement techniques and procedures that are not well known to the public as well as non-public details about the use, application, or deployment of well-known techniques and procedures. *See, e.g., Soghoian v. Dep't of Just.*, 885 F. Supp. 2d 62, 75 (D.D.C. 2012) (protecting non-public details about use of electronic surveillance because disclosing what information is collected during surveillance, how it is collected, and when it is not collected could allow criminals to evade detection); *McGehee v. Dep't of Just.*, 800 F. Supp. 2d 220, 236-37 (D.D.C. 2011) (finding that Exemption 7(E) does not require that techniques be unknown to public where release of non-public details of such techniques would allow them to be circumvented).

"Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] 'demonstrate[] logically how the release of [the requested] information might create a risk of circumvention of the law.'" *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1192-1194 (D.C. Cir. 2009). Therefore, Exemption 7(E) "exempts from disclosure information that could increase the risks that a law will be violated or that past violators will escape legal consequences." *See id.* at 1193.

Records that reveal areas that are difficult for Border Patrol to access and areas patrolled by fewer agents disclose the CBP's operations and vulnerabilities, and the disclosure of this information could risk circumvention of the law. *See Showing Animals Respect & Kindness*, 730 F. Supp. 2d 180, 198-99 (finding that documents detailing surveillance techniques logically risked circumvention of the law because, "although trespassers and poachers . . . likely know that they are subject to surveillance, the details of the surveillance techniques are unknown to them"); *Blanton v. Dep't of Just.*, 63 F. Supp. 2d 35, 49-50 (D.D.C. 1999) (holding that Exemption 7(E) applies to documents revealing FBI polygraph techniques because although general information on the polygraph test is "often depicted and discussed," the "specific methods employed by the FBI" are not generally known); *see also Gilman v. Dep't of Homeland Sec.*, 32 F. Supp. 3d at 21-22 (crediting two CBP declarations demonstrating not genuine issue of material fact that release of information "such as terrain and geographic location are identifiable by sight" "would aid those attempting to cross the border as well as 'smugglers and criminal elements' in their determination of CBP's vulnerabilities along the border.").

"*How* [Defendants] employ[] public information may not be known and can itself disclose law enforcement techniques and procedures." *Am. Immig. Lawyers Ass'n v. Dep't of Homeland Sec.*, 485 F. Supp. 3d 100, 112 (D.D.C. 2020) [emphasis in original] (citing *Shapiro v. DOJ*, 893 F.3d 796, 800 (D.C. Cir. 2018) ("[E]ven if a database is available and its search terms are available to the public, the methods that the FBI uses to search the database and what results it considers meaningful . . . can reveal law enforcement techniques and procedures").  As the Court has already noted "the release of detention center information would provide over 4 million points of location data that would enable human traffickers and smugglers to evade the

law." Memo. Op. at 9-10 (citing Howard Decl. at ¶ 25). Moreover, the Howard Decl. also warned about the risk of the "mosaic effect[]" and data "aggregation from public, private, breached, or open sources[.]" Howard Decl. at 10 ¶ 36. When taken together, the mass of data being released in this case could form "a mosaic that [and] when viewed as a whole, would reveal confidential law enforcement techniques and procedures and would risk circumvention of the law." *See Shapiro v. DOJ*, 239 F. Supp. 3d 100, 115 (D.D.C. 2016).

Because Plaintiff cannot raise a genuine issue of material fact that "[t]o further subdivide the data relating to Sectors into more specific locations linked to particular Border Patrol Stations risks revealing if and when coverage areas between Border Patrol Stations overlap or have gaps, which Station's Agents may face the heaviest workload at any given time," summary judgment for the Defendant is warranted. *See* Visconti Decl. at 4 ¶ 10. Detention Center "holding capacity[ies] . . . easily be exploited and manipulated to cripple CBP operations and the overall system, such as by staging a mass incursion at strategically selected facilities with limited staffing or capacity." *Id*. The Visconti Declaration demonstrates that there is no meaningful or logical basis to distinguish between where individual are apprehended versus where they are detained. *Id*. Both the Howard and Visconti Declarations logically demonstrate how the release of additional data risks circumvention of the law. Thus, for the foregoing reasons, any additional database information Plaintiff seeks is exempt under FOIA Exemption 7(E).

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully proffer that summary judgment is warranted and should be entered in Defendants' favor.

September 20, 2022                    Respectfully submitted,


                                     MATTHEW M. GRAVES, D.C. Bar #481052
                                     United States Attorney

                                     BRIAN P. HUDAK
                                     Chief, Civil Division

                                     By:_____/s/_____
                                     KENNETH ADEBONOJO
                                     Assistant United States Attorney
                                     601 D Street, N.W. Civil Division
                                     Washington, D.C.  20530
                                     Telephone: (202) 252-2562


                                     24