### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____

)
**BUZZFEED, INC.**                                           )
                                                             )
          **Plaintiff,**                                     )
                                                             )          **Civil Action No. 19-cv-3062 (DLF)**
          **v.**                                             )
                                                             )
**U.S. DEP'T OF HOMELAND SEC. &**                            )
**U.S. CUSTOMS AND BORDER**                                  )
**PROTECTION,**                                              )
                                                             )
          **Defendants.**                                    )
_____)

### DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR
### SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS
### RENEWED MOTION FOR SUMMARY JUDGMENT

The Department of Homeland Security, *et al*. ("Defendants" or "DHS"), by and through

the undersigned counsel, respectfully submit this Opposition to Plaintiff's Cross-Motion for

Summary Judgment and Reply in support of its Motion for Summary Judgment.   In this action

under the Freedom of Information Act, 5 U.S.C. § 552, *et seq*. ("FOIA"), the issues before the

Court concern whether A-Numbers or A-Number alternates and privacy issues related to them

are protected under FOIA Exemptions 6 and 7(C); whether information about the location of

"detention centers" was properly withheld under FOIA Exemption 7(E) because their disclosure

could reasonably be expected to result in circumvention of the law; and finally whether "variable

definitions from the EID" withheld in this case are identical with those released in *Long v. ICE*,

464 F. Supp. 3d 409 (D.D.C. 2020) ("*Long*").

## ARGUMENT

### A-NUMBERS AND A-NUMBER ALTERNATES

It is well-settled that FOIA Exemptions 6 and 7(C) "affords broad[] privacy rights to suspects, witnesses, and investigators." *Bast v. DOJ*, 665 F.2d 1251, 1254 (D.C. Cir. 1981). Throughout this litigation, Defendants have argued, Personal Identifiable Information ("PII"), like Alien Registration Numbers ("A-Numbers"), Driver's License Numbers, are exempt from disclosure under FOIA Exemptions 6 and 7(C).  *See* ECF No. 37, *see also* Declaration of Patrick Howard ("Howard Decl."); ECF No. 52 (Supplemental Declarations of Jay Visconti ("Visconti Decl.") and Deborah L. Danisek ("Danisek Decl.").   The D.C. Circuit has long applied a categorical rule, known as the "*SafeCard* rule," "permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'"  *Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003) (quoting *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)).   *SafeCard* also rejected the argument that "access to the names and addresses of potential witnesses or litigants … would [] SafeCard and the public with insight into the SEC's conduct . . . because the type of information sought is simply not very probative of an agency's behavior or performance."   *SafeCard*, 926 F.2d at 1205-06.

Plaintiff has argued that the release of A-Numbers, by themselves, are "actually identifying" and that the potential harms that Defendants have demonstrated are speculative and conclusory.   *See generally* ECF No. 39-1; *see also* ECF No. 58-1 ("Pl's Opp'n").   From the outset, Defendants have stated that they learned for the first time that Plaintiff was seeking PII

over a year after Plaintiff initially submitted their FOIA request and Defendants customized a response because there were not readily available responsive records.   *See* Howard Decl. at ¶ 26. "[T]he Initial Request directed that A-file information be removed or redacted, and that records stored in separate tables should not be joined."   Howard Decl. at 34; *see also* Compl. Ex. A, (wherein the FOIA request forming the basis for this action states "All columns containing A-file information can be pre-emptively removed and/or redacted.")[1]   The responsive data is "found within the Enforcement Integrated Database ('EID') [which] captures and maintains information related to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and criminal law enforcement investigations and operations conducted by [Defendants]."   Howard Decl. at ¶ 21.[2]

"A-numbers and biometric identifiers identify an individual without any other identifying information, much like a Social Security Number (SSN). Within DHS, such identifiers are granted the highest level of sensitivity and data protection as 'Sensitive Personally Identifiable Information (PII)).'"   Danisek Decl. at ¶ 5.   "Some categories of PII are sensitive as stand-alone data elements, including your Social Security number (SSN) and driver's license or state identification number. Other data elements such as citizenship or immigration status, medical

---

[1]   "Neither the query nor the underlying dataset included a database-generated, person-specific identifier. The underlying dataset does include a database-generated, event-specific identifier linked to the details of a particular apprehension."   Visconti Decl. at ¶ 7.

[2]   The responsive data spanned the years January 2010 to 2019 and included specific data from all Southwest Border Sectors, including Border Patrol sector, Date and Time of Apprehension, Citizenship, Gender, Age, Demographic, Time in the U.S., Date and Time of Initial Booking, Date and Time of Final Booking, Time in Custody.   *See* Howard Decl. at ¶ 24. The response was massive comprising almost 4.5 million "unredacted rows of responsive data, reflecting the data fields listed above."   *Id*.

information, ethnic, religious, sexual orientation, or lifestyle information, in conjunction with the identity of an individual (directly or indirectly inferred), are also PII." *Id.* "[A]n individual's A-number is unique and applies to a single individual, and" if disclosed "even without any additional identifying information or context . . . can be used to link individuals to files or information that may contain highly personal and sensitive information. *Id.* ¶ 6.

Unless information identifying third parties "is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure." *SafeCard Servs*., Inc., 926 F.2d at 1206. This Court has held that private individuals have a privacy interest in withholding their "names, dates of birth, telephone numbers, social security numbers, [and] driver's license numbers . . . for third-party individuals." *Pinson v. DOJ*, 313 F. Supp. 3d 88, 116 (D.D.C. 2018); *Banks v. DOJ*, 813 F. Supp. 2d 132, (D.D.C. 2011) ("The USPIS [properly] with[e]ld[] under Exemption 7(C) (1) the names of agents; (2) the names & personal information such as address and phone numbers of individuals who provided information in the investigation; (3) Social Security numbers, drivers' license numbers, credit card numbers and license plate numbers."). In *American Civil Liberties Union Immigrants' Rights Project v. United States Immigration and Customs Enforcement*, the Court easily recognized that "A-numbers are personally identifying information, which are protected from disclosure by the FOIA" and held that FOIA did not require the Agency to replace A-numbers with Unique IDs. *Am. C.L. Union Immigrants' Rts. Project v. ICE,* No. 19 CIV. 7058 (GBD), 2021 WL 918235, at *2 (S.D.N.Y. Mar. 10, 2021). Per the foregoing caselaw, it would be tantamount to Defendants disclosing the names of individuals to a third party without the individuals' consent and a showing on illegality by the Government.

4

Agencies, and hence courts, must evaluate the risk of disclosing records not simply in terms of what the requester might do with the information, but also in terms of what anyone else might do with it.   *See Swan v. SEC*, 96 F.3d 498, 500 (D.C. Cir. 1996).   In this case, the Court should consider that "[t]he more discrete details about an individual are disclosed, the stronger is the 'mosaic effect,' whereby data may be aggregated from public, private, breached,[3] or open sources to identify or profile an individual, family, or social group."   Howard Decl. at ¶ 36. "Ubiquitous targeted advertising exemplifies the power and sophistication of aggregated data. In this case, CBP has already produced data regarding the individuals' age, citizenship, gender, and apprehension details in the context of a Border Patrol encounter."   *Id*.   In light of the fact that Defendants released almost 4.5 million rows of unredacted data, the risk that Plaintiff or others would be able to divine Plaintiff's identity from the release of A-Number or A-Number alternates cannot be ignored.

Under the mosaic theory, seemingly innocuous information when taken together in the aggregate could reveal protected information, a seasoned requester could piece together this information to draw conclusions that may not be possible absent data of the kind released in this

---

[3]      The threat of breach and cyberattack on immigration data is neither speculative, nor limited to United States immigration agencies, as illustrated by accounts of cyberattacks across the globe. See e.g. https://www.newsweek.com/argentina-ransom-hackers-bitcoin-1530889 (cyberattack shuts down Argentine border); https://www.infosecurity-magazine.com/news/french-visa-applicants-cyber-attack/ ("cyberattack disclosing personal details of applicants for French visas); https://www.wsj.com/articles/border-agency-subcontractor-hit-by-cyberattack-11560215532 (cyberattack on agency subcontractor); https://www.voanews.com/a/albania-suffers-2nd-cyberattack-blames-iran/6739582.html (cyberattack shuts down Albanian seaports, airports, and border posts); https://apnews.com/article/united-states-immigration-us-and-customs-enforcement-government-politics-4e7fdf1100d42569fbdbc1379e1aaf1c (refugee advocates alarmed at brief, accidental disclosure of A-numbers). Courts may take notice of the prevalent cyberthreat to migrants' personal information collected by law enforcement pursuant to Rule 201.

case.  *See e.g. Reporters Comm. for Freedom of the Press v. FBI*, 548 F. Supp. 3d 185, 199-200 (D.D.C. 2021); *see also Shapiro v. United States DOJ*, 239 F. Supp. 3d 100, 118 (D.D.C. 2017) ("Plaintiffs' request must be construed as part of a larger mosaic.   Understood in that manner, aggregate information about the number of files or documents that bear a designation for [terrorism] may shed considerable light on the overall resources that a particular office . . . is devoting to investigating related crimes.").   Defendants must consider the risks posed by disclosing personally identifying information like A-Number or alternatives in light of the massive amount of data released in order to protect third parties' privacy.   "A-numbers and fingerprint identification numbers are *unique* to an individual person [].   This customized query did not pull A-numbers or fingerprint identification numbers as A-numbers and fingerprint identification numbers are considered to be sensitive [PII] exempt from disclosure under FOIA." Visconti Decl. at ¶ 7.

Moreover, "[r]elying on A-numbers, fingerprint identification numbers, or database-generated event-centric identifiers to track an individual person across multiple datasets could yield incomplete or misleading results.   For example, not every noncitizen is issued an A-number; fingerprint data may be incomplete; and a single person who has encountered USBP multiple times may have multiple database-generated event-centric identifiers."  *Id*.   "EID is a live database and a non-citizens record could be updated at any time.   So, the subset of EID . . . accessed by CBP to respond to Plaintiff's FOIA request, is accurate as of the date that the data was pulled for the query."  *Id*. ¶ 5.   Also, there is a concern about "unauthorized access to CBP systems, such as via hacking or insider misuse, these identifiers could be used to quickly access identifying information about specific people and their private information in the CBP database,

as well as sensitive law enforcement data about the encounter, including but not limited to names and locations of specific law enforcement operations." *Id*. at 8. "Disclosure of identifiers raises the risk of additional damage an unauthorized user may cause, with greater speed, and with lower risk of detection[]" thereby putting third parties' private information at risk. *Id*.

It bears repeating that Plaintiff's FOIA request was event-centric and Plaintiff's only sought PII after a customized response had been crafted.[4] Moreover, an Agency cannot waive third parties' privacy interests under FOIA Exemptions 6 and 7(C) because those interests belong to the individuals and not to the agency. *See DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-66 (1989); *see also Comp. Prof'ls for Soc. Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996) (acknowledging that agency must disclose responsive information for individuals who "provided [] waivers of their privacy rights").

If Plaintiff's proffered public interest is seeking "records that would allow the public to determine the extent of overcrowding and prolonged detention of children in immigration detention facilities, then the current release of almost 4.5 million unredacted lines of data more than answers Plaintiff's question. Specifically, the release addresses, *inter alia*, the following information: Time in the U.S.; Date and Time of Initial Booking; Date and Time of Final Booking; and Time in Custody. The datapoints provide responses that are specifically responsive to Plaintiff's stated public interest. The only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light

---

[4]        "Retrieving A-numbers or fingerprint identification numbers would require rewriting the customized query and conducting a new search in this case. Anonymizing A-numbers or fingerprint identification numbers would require creation of an entirely new field of data across multiple datasets." Visconti Decl. at 9.

on an agency's performance of its statutory duties or otherwise let citizens know what their

government is up to.   *See Elec. Privacy Info. Ctr. v.* DOJ, 118 F.4th 712, 721-22 (D.C. Cir.

2021).   "BuzzFeed must still show that "the information is likely to advance that interest."   *Id*.

(citing *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).   Plaintiff is not

entitled to information that violates third parties' privacy interests in order to understand what

Defendants are "up to" regarding the overcrowding referenced in the RGV Alert.   *See Humane*

*Soc'y of the United States v. Animal & Plant Health Inspection Serv*. 386 F. Supp. 3d 34, 46

(D.D.C. 2019) ("[T]he Humane Society has all it needs to tie these records to particular facilities.

The Service released the licensees' names and customer ID numbers.   Indeed, the Humane

Society made targeted requests using the licensees' certificate numbers, so there is no need for

licensees' addresses to further tie the records to a particular facility."); *Taitz v. Astrue*, 806 F.

Supp. 2d 214, 219 (D.D.C. 2011), *aff'd*, No. 11-5304, 2012 U.S. App. Lexis 10713, 2012 WL

1930959 (D.C. Cir. 2012) (the President's privacy interest in information related to his social

security number is not outweighed by the public interest in confirming his constitutional

qualifications for the presidency).   Likewise, third parties' A-Numbers or A-Number alternates

should not be disclosed where Plaintiff already has sufficient information that satisfies its stated

public interest.

**SPECIFIC LOCATION INFORMATION**

With regard to the location data, a shared vocabulary is important to a clear

understanding of the issues. Specifically, the FOIA request at issue in this case sought records

relevant to CBP's Border Patrol Stations and Border Patrol Processing Centers, but not records

related to the operation of detention facilities operated by U.S. Customs and Immigration

Enforcement, which is a separate agency within the Department of Homeland Security.[5]

In their Complaint, Plaintiffs described their FOIA request as "pertaining to Border Patrol's custody databases that the DHS Office of Inspector General used in a specific memorandum regarding dangerous overcrowding in Rio Grande Valley *Detention Center*" (*emphasis added*). By contrast, the OIG report specified in Plaintiff's FOIA Request is titled "Management Alert - DHS Needs to Address Dangerous Overcrowding and Prolonged Detention of Children and Adults in the Rio Grande Valley."[6]   Plaintiff's insertion of the term "Detention Center" blurs a key distinction between the kinds of CBP (Border Patrol) data sought in this case versus the data collected and utilized by ICE in the operation of its suite of detention facilities.

The scope of the OIG report that forms the basis of the instant FOIA request is clearly articulated on the second page: "We visited the McAllen, Weslaco, and Fort Brown Border Patrol Stations, and the Border Patrol Centralized Processing Center and Donna Processing Center.   We also visited the Hidalgo and Progreso ports of entry" and "This management alert addresses overcrowding at four of the five Border Patrol facilities, and prolonged detention at all five facilities, we visited in the Rio Grande Valley." The OIG report described the issues created by overcrowding at Border Patrol Stations and two Border Patrol Processing Centers precisely because these Border Patrol facilities are not and were never designed to accommodate prolonged detention or long-term housing. As noted in the OIG report specified in the Complaint

---

[5]      https://www.ice.gov/about-ice/ero; https://www.ice.gov/detain/detention-management

[6]      https://www.oig.dhs.gov/sites/default/files/assets/2019-07/OIG-19-51-Jul19_.pdf#:~:text=Management%20Alert%20%E2%80%93%20DHS%20Needs%20to%20Address%20Dangerous,urgent%20issues%20that%20require%20immediate%20attention%20and%20action.

and underlying FOIA request:

> "CBP is responsible solely for providing short-term detention for aliens arriving in the United States without valid travel documents. CBP detains such individuals on a short-term basis to allow for initial processing, and then transfers the individuals to other government agencies. However, even when CBP has completed its initial processing obligations, it cannot transfer detainees out of its facilities until U.S. Immigration and Customs Enforcement (ICE) has space for single adults and some families, and the U.S. Department of Health and Human Services (HHS) has space for Unaccompanied Children. Currently, because both ICE and HHS are operating at or above capacity, CBP has experienced increasing instances of prolonged detention in its facilities."

Plaintiffs' FOIA request sought public disclosure of databases containing the records used by OIG to calculate the duration that people "at these facilities had been held." The facilities were identified in the OIG report as Three Border Patrol stations and two processing centers.

The distinction between an ICE detention facility and a CBP Border Patrol Station is pivotal to understanding why disclosing the location data requested in this case could reasonably be expected to result in circumvention of the law.   Plaintiff has not requested the location of the Border Patrol Stations themselves, as such information is publicly available, but rather an additional data field identifying the location for each of the rows of data produced, Border Patrol encounters.

"To further subdivide the data relating to Sectors into more specific locations . . . risks revealing if and when coverage areas between Border Patrol Stations overlap or have gaps, which Station's Agents may face the heaviest workload at any given time."   Visconti Decl. at ¶ 10.   Such information may facilitate circumvention of U.S. law by enabling violators to choose to illegally cross or facilitate smuggling of persons across the border within the area of

operation of a particular Station that has shown to have lower rates of apprehensions."   *Id*. Furthermore, "[t]he information on the number of individuals apprehended or found inadmissible in certain areas also provides a detailed picture of which areas of the southern border may be facing resource constraints."   *Id*.   Plaintiff does not contest that this withholding is a "technique or procedure" under FOIA Exemption 7(E).   Therefore, the only question is whether the disclosure of location data in a release of this size risks circumvention of the law.   Again, the mosaic theory is relevant here because things that do not make sense to the untrained eye would make all too much sense from what the rows of data could reveal about sources and methods. *See United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989).

Other courts have found that under the "heat map" in the mosaic context, the release of only 122 FBI file numbers "could create a 'heat map' of the areas of the Country 'where engaging in anarchist extremism is more or less risky from a law enforcement standpoint." *Shapiro*, 239 F. Supp. 3d at 118.   The same concerns exist here.   "The information on the number of individuals apprehended or found inadmissible in certain areas also provides a detailed picture of which areas of the southern border may be facing resource constraints." Visconti Decl. ¶ 10.   Here, the release is of almost 4.5 million unredacted rows of data that could yield a bonanza for the trained eye.   Clearly, if a court had concerns over the disclosure of a mere 122 FBI file numbers, the concerns over information that can be conjured from a production of this size and used to circumvent the law are exponential.   Defendants have demonstrated enough to satisfy FOIA Exemption 7(E)'s "low bar."   Exemption 7(E) does not impose "a highly specific burden of showing how the law will be circumvented."   *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009).

To further subdivide the data relating to Sectors into more specific locations . . . risks revealing if and when coverage areas between Border Patrol Stations overlap or have gaps,   thus revealing which Station's Agents may face the heaviest workload at any given time.   Visconti Decl. at ¶ 10.   Such information discloses the Defendants' operations and vulnerabilities, which are not readily-accessible public information, the disclosure of which could risk appropriation to circumvent the law.   *See Showing Animals Respect & Kindness*, 730 F. Supp. 2d 180, 200 (D.D.C. 2010) (finding that documents detailing surveillance techniques logically risked circumvention of the law because, "although trespassers and poachers . . . likely know that they are subject to surveillance, the details of the surveillance techniques are unknown to them"); *Blanton v. DOJ*, 63 F. Supp. 2d 35, 49-50 (D.D.C. 1999) (holding that Exemption 7(E) applies to documents revealing FBI polygraph techniques because although general information on the polygraph test is "often depicted and discussed," the "specific methods employed by the FBI" are not generally known).   The level of specificity that can be gleaned from such a massive data release as this case presents could enable a trained eye to circumvent the law.

### EID INFORMATION

Finally, the question arises whether "variable definitions from the EID" withheld in this case are identical with those released in *Long v. ICE*, 464 F. Supp. 3d 409 (D.D.C. 2020) ("*Long*")[.7]   First, the data in this case did not come directly from EID, but rather was a snapshot of a subset of EID.   *See generally* Visconti Decl. (explaining BPETS, BPETS2, and SNAP).   Second, information regarding CBP's snapshot was not released in *Long* at all.   Prior to the

---

[7]       The EID lookup table was previously provided to the Plaintiffs.   A copy can be provided to the Court if the Court deems it to be useful.

2020 *Long* decision, the Court in *Long v. ICE*, 149 F. Supp. 3d 39 (D.D.C. 2015) wholly rejected the FOIA request for CBP's *snapshot* of a *subset* of *EID* data.   Nevertheless, in an effort to resolve the instant case, Defendant's technical experts created a specific program to generate spreadsheets pulled from negotiated data fields within its snapshot.   *Compare Long v. ICE*, 149 F. Supp. 3d 39, 49–50 (D.D.C. 2015) (comparing a readily reproducible record from unreasonably burdensome production of a redacted snapshot).   The data fields in the provided spreadsheets were agreed-upon by the parties and are self-evident, requiring no additional variable definition, i.e. "Mexico" means Mexico; "Male" means male; and "over 1 year" means over one year, etc.

## CONCLUSION

For the foregoing reasons, Defendant's renewed motion for summary judgment should be granted.

January 20, 2023                    Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:_____/s/_____
KENNETH ADEBONOJO
Assistant United States Attorney
601 D Street, N.W. Civil Division
Washington, D.C.   20530
Telephone: (202) 252-2562